IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

North Bay Trust Company, and North Bay Underwriting Company,

Plaintiffs,

v.

Village at Sandhill, LLC,

Defendant.

**Civil Action No.:** 3:26-cv-4374-MGL

**COMPLAINT**
**(DECLARATORY JUDGMENT & INJUNCTIVE RELIEF)**

The Plaintiffs, North Bay Trust Company and North Bay Underwriting Company (collectively, "Plaintiffs" or "North Bay") complaining of the Defendant, Village at Sandhill, LLC ("Defendant") allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff North Bay Trust Company is a corporation organized and existing under the laws of the State of Florida with its principal place of business in the State of Florida and is authorized by the State of South Carolina to conduct business in this State.

2. Plaintiff North Bay Underwriting Company is a corporation organized and existing under the laws of the State of Florida with its principal place of business in the State of Florida and is authorized by the State of South Carolina to conduct business in this state.

3. Defendant Village at Sandhill, LLC is a limited liability company organized and existing under the laws of the State of South Carolina with its principal place of business in Richland County, South Carolina.

4. Defendant holds itself out as the developer of the Village at Sandhill ("Sandhill Development"), a mixed-use community of retail, service retail, and residential uses, each under

distinct ownership. The Sandhill Development was ostensibly designed to be a planned community of symbiotic uses whose owners agreed that their respective real estate parcels would be governed and operated in a coordinated fashion a to-be-formed South Carolina corporation that would be formed, pursuant to Section 27-30-120 South Carolina Code of laws, as: "…as entity developed to manage and maintain a planned community…" ("Owners' Association") and would be operated for the mutual and reciprocal benefit of all owners of real estate within the Sandhill Development.

5. Upon information and belief, Village at Sandhill, LLC is owned in whole or in part or is controlled by Alan Kahn and Charles Kahn.

6. Jurisdiction is proper as the Plaintiffs are citizens of a state other than South Carolina, the Defendant is a citizen of the state of South Carolina, and the amount in controversy exceeds $75,000, exclusive of interest and costs; there is complete diversity of citizenship and therefore, this Court has jurisdiction in accordance with Title 28 U.S.C. §1332(a)(1).

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) because a substantial part of the events giving rise to the claim occurred in this Division of this District in South Carolina, as the Plaintiffs own real property in Richland County, South Carolina that is the subject of this action. Said real property is burdened by the covenants and restrictions established and administered by the Defendant.

8. This matter is brought pursuant to Rule 57 of the Federal Rules of Civil Procedure and pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 and §2202, as the Plaintiffs seek a declaration of the rights and legal relations with the Defendant.

9. This matter also seeks preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

**INTRODUCTION-THE VILLAGE AT SANDHILL DEVELOPMENT AND THE PROMENADE BUILDINGS**

10. The Declarant was the applicant for the various municipal development rights which enabled and authorized the establishment of the Sandhill Development. Those rights are established in that certain Development Agreement dated March 20, 2001, by and between the Defendant (as the Developer) and the County of Richland, recorded in Record Book 496, at Page 1861, Richland County, South Carolina and referenced in that certain Title to Real Estate dated February 28, 2002 from Clemson University to Cole's Restaurant, Inc., Kahn Properties South, LLC, and Kahn Family LLC, and recorded in Record Book 631, at Page 2491, Richland County, South Carolina.

11. On or about September 10, 2003, Defendant—as the planner and developer of the Sandhill Development, a mixed-use community of retail, service retail, and residential uses located in the northeast area of Columbia, South Carolina—recorded in the office of the Richland County Register of Deeds a Master Declaration of Covenants, Conditions and Restrictions for Village at Sandhill at Book 00849, Page 1881 (the "Master Declaration") and a Declaration of Operation and Easement Agreement at Book 00849, Page 1921 (the "OEA"). The Master Declaration (without amendments) is attached at Exhibit A hereto and the OEA (without amendments), is attached at Exhibit B hereto.

12. By the Master Declaration, the Owners' Association was formed, pursuant to Section 27-30-120 South Carolina Code of Laws, as: "…an entity developed to manage and maintain a planned community… for which there is a declaration requiring a person, by virtue of his ownership of a separate property within the planned community… to pay assessments…"

13. The Owners' Association holds itself out as being the association that represents all owners of real property located in the Sandhill Development and that operates for the benefit of all such owners.

14. Per Article IX, Section 9.03 of the Master Declaration, The Architectural Review Committee of the Owners' Association, Inc. ("ARC") is a committee of the Owners' Association whose members are not appointed by the Owners' Association but rather are appointed by the Defendant. The ARC has the authority under the Master Declaration to independently enforce the covenants of the Master Declaration, which means that the ARC (i.e., the Defendant) could seek to enforce the covenants even if the Owners' Association (i.e., the actual owners of property within the Sandhill Development) did not wish to do so.

15. Upon information and belief, Alan, Kahn, Charles Kahn, and Charles Howell are currently the members of the ARC.

16. Upon information and belief, the Defendant is a member of the Owners' Association.

17. Section 3.3(B) of the OEA provides that the Defendant is an "Approving Party," defined in Section 1.13 of the OEA as being the Defendant, as Developer, together with owners of each tract within the Sandhill Development.

18. Section 3.3(B) of the OEA further provides that plans for the initial construction on, and additions, remodeling or reconstruction of, the exteriors of buildings within the Sandhill Development must be approved by the "Approving Parties," which includes the Defendant.

19. Through the ARC and the OAE, the Defendant essentially controls all development at the Sandhill Development.

20. On April 27, 2007, VAS Condominium, LLC, through its manager Alan Kahn, executed a Master Deed for a parcel located within the Sandhill Development, and submitted such

parcel to a horizontal property regime, as same is authorized in the South Carolina Horizontal Property Act, codified in Chapter 31 of the South Carolina Code of Laws. Such horizontal property regime was named "Promenade at Sandhill Condominium" ("Promenade Condominium").

21. The four buildings which comprise the Promenade Condominium were constructed beginning in or about 2006 by the Defendant. These four buildings (collectively, the "Condominium Buildings") are identified as Buildings H, M, N, and O and are also known by the names Monaco, Naples, Antigua, and Portofino. Each of the Condominium Buildings as constructed was comprised of either three or four floors, with commercial space on the ground floor and residential units on the upper floors.

22. The Condominium Buildings which comprise the Promenade Condominium were constructed by M.B. Kahn Construction Co., Inc., a licensed general contractor in South Carolina that at one time was owned in whole or in part by Alan Kahn, the original developer of the Sandhill Development, by or through one or more of his affiliated or controlled development entities including, but not limited to, the Defendant.

23. Any knowledge or information regarding the Condominium Buildings that Alan Kahn or Charles Kahn obtained through their positions with the Owners' Association and/or ARC is imputed to Defendant.

24. Alan Kahn executed the Master Declaration and the OAE, as President of the Defendant and also executed the Master Deed which establishes the Promenade Condominium.

25. Wells Fargo Bank was the principal lender to the Defendant for the construction and development of the Promenade Condominium.

26. Upon information and belief, sometime after the completion of the Condominium Buildings, and after one or more loan restructurings between the Defendant/ borrower and the

Wells Fargo lender, the Defendant/borrower was unable to meet its financial obligations to Wells Fargo under the Promenade Condominium loan, and Wells Fargo or one of its affiliated entities ("Wells Fargo") foreclosed on the Promenade Condominium or, through other means, took ownership of the Promenade Condominium from the afore-enumerated Kahn-affiliated entities.

27. The Plaintiffs obtained control of the Promenade Condominium through a purchase from Wells Fargo that occurred in 2020.

28. By mid-2026, the Plaintiffs had obtained one hundred (100%) percent ownership of all units in the Promenade Condominium.

29. Plaintiff North Bay Trust Company owns one hundred (100%) percent of the residential units in the Promenade Condominium.

30. Plaintiff North Bay Underwriting Company owns one hundred (100%) percent of the retail units in the Promenade Condominium.

31. Plaintiff North Bay Trust Company, as owner of the residential units in the Promenade Condominium, is a member of the Owners' Association.

32. Plaintiff North Bay Underwriting Company, as owner of the retail units in the Promenade Condominium, is a member of the Owners' Association.

33. The Promenade Condominium consists of four buildings, each having multiple ground floor retail units owned by North Bay Underwriting Company, and each having multiple upper floor residential units owned by North Bay Trust Company.

34. There are no units in the Promenade Condominium that are owned by any person or entity other than Plaintiff North Bay Trust Company and Plaintiff North Bay Underwriting Company.

**THE CONDITION OF THE CONDOMINIUM BUILDINGS**

35. Immediately after their construction, the Condominium Buildings began showing signs of rapid deterioration and de-cladding of the concrete stucco exteriors of the Condominium Buildings. In or about April of 2015, Wells Fargo caused a lawsuit to be filed in the Richland County Court of Common Pleas captioned *Promenade at Sandhill Condominium Association, Inc. by and for itself and its Owner and Members v. M..B. Kahn Construction Co., Inc., et al,* Civil Action No. 2015-CP-40-02501 against numerous parties involved in the development and construction of the Condominium Buildings, including M.B. Kahn Construction Co., Inc., alleging various defects and deficiencies in the construction of the buildings ("Construction Defect Suit"), which allegations were denied by those defendants. The Construction Defect Suit was resolved and dismissed in 2023.

36. In the period between discovery of the issues in the interiors and exteriors of the Condominium Buildings and the progress of the Construction Defect Suit, the Condominium Buildings continued to deteriorate as to both their interiors and exteriors and the de-cladding of the Condominium Buildings concrete stucco exteriors continued. Such deterioration was and is in the interiors of the structures and has also been visible externally for years. This deterioration has continued through the present.

37. The deterioration of the inside and outside of the Condominium Buildings made them unsafe for human habitation or occupancy and the de-cladding of the concrete stucco exteriors and window frame systems all have posed an actual risk to pedestrians on the ground in the event of falling concrete and windows.

38. Defendant, the Owners' Association, and the ARC have been aware of the negative interior and exterior issues with the Condominium Buildings for years.

39. In the fall of 2022, a six foot by four-foot piece of the concrete stucco ceiling of a balcony of one of the Condominium Buildings sheared off, injuring a resident of the building.

40. Ultimately, after consulting with experts, Plaintiffs determined that the Condominium Buildings were not safe for occupancy and ended all residential and commercial tenancies in all the Condominium Buildings.

41. Since 2024, the Promenade Condominium buildings have been empty with no tenants.

**THE ACTIONS AND INACTION OF THE DEFENDANT, THE OWNERS' ASSOCIATION AND ARC**

42. The incumbent Board of Directors of the Owners' Association consists of Alan Kahn, his son Charles Kahn, and a person who is the designated representative of a third-party owner of a lot within the Sandhill Development.

43. The Master Declaration repeatedly provides that the three-person ARC must take certain actions, specifically: promulgate standards for signage throughout the Sandhill Development; promote aesthetic standards for buildings, fences, and signage within the Sandhill Development; and review plans for construction of new and renovated improvements within the Sandhill Development.

44. Upon information and belief and for a multiple year period prior to and ending in late 2024, the Board of Directors of the Owners' Association, then-consisting of solely Alan Kahn and his son Charles Kahn, failed to create the ARC that is required by the terms of the Master Declaration. Thus, no ARC action was taken concerning the review of plans for proposed construction of "Buildings," or fences, or signage on any of the Lots within the Sandhill Development during this period.

45. Upon information and belief and for a multiple year period prior to and ending in late 2024, Defendant failed to perform its duties as an "Approving Party" concerning plans for initial

construction on, and additions, remodeling or reconstruction of, the exteriors of buildings within the Sandhill Development.

46. Upon information and belief, in the 22-year period between January 2004 and February 2026, approximately 132 building permits for construction that included new exterior construction within the Sandhill Development were applied for with Richland County, South Carolina.

47. The Owners' Association executed and recorded amendments to the Master Declaration in order to evidence the Owners' Association's approval of new construction on a Lot within the Sandhill Development.

48. Upon information and belief, in that same 22-year time period from January 2004 through February 2026, the Defendant executed and recorded only seven (7) amendments to the OEA, evidencing Defendant's approval of the exteriors of new "Buildings" for construction on a Lot within the Sandhill Development.

49. Had the provisions of Section 10.02(b) of the Master Declaration been followed, the ARC should have reviewed plans for the 132 new construction projects with exterior construction within the Sandhill Development for which building permits were applied, as evidenced by the Public Records of the Richland County Building Department.

50. Upon information and belief, Had the provisions of Section 3.3(B) of the OEA been followed, the Defendant, as Declarant and an "Approving Party" should have reviewed plans for the 132 construction projects with exterior construction within the Sandhill Development for which building permits were applied, as evidenced by the Public Records of the Richland County Building Department.

51. Upon information and belief, in 2007-2008 when the Condominium Buildings were designed by Alan Kahn, as manager of VAS Condominium, LLC, Alan Kahn, as president of the

Owners' Association, and, on information and belief, Alan Kahn as a beneficial owner of the Defendant did not require that the mandatory review process for construction of new Buildings within the Sandhill Development be followed or that an amendment to the Master Declaration be recorded.

52. Therefore, upon information and belief, for a multi-year period the Defendant, the Owners' Association, and the ARC failed to enforce the Master Declaration and OEA with respect to mandatory ARC approval and mandatory review by the Defendant, as Declarant and an "Approving Party," for new exterior construction within the Sandhill Development for years.

**<u>THE FIRST DEMOLITION ATTEMPT BY PLAINTIFFS</u>**

53. The Plaintiffs received a licensed professional engineer's safety assessment report from Stantec Consulting Engineers, dated February 9, 2024, which concluded that the then current state of the Condominium Buildings presented numerous violations of the applicable building codes, and that these violations led to significant public safety concerns. The Stantec engineers found of specific concern the interior and exterior physical conditions of the Condominium Buildings, and the continued de-cladding of the Condominium Buildings' concrete stucco exteriors. Stantec recommended that the Condominium Buildings be demolished or, if economically viable under a cost/benefit analysis, such buildings could be reconstructed.

54. The Richland County Director of Building Inspections/Building Official in a Memorandum for Record of February 29, 2024 agreed with the recommendations of the February 9, 2024 Stantec report.

55. Plaintiffs fenced in and secured the Condominium Buildings from occupancy due to the hazardous conditions. Plaintiffs thereafter paid for security and other measures to protect the public.

56. Due to the extreme deterioration including significant de-cladding of the exteriors of the Condominium Buildings, and the real-world facts of the significant personal injury to a Promenade Condominium resident due to falling concrete from the de-cladding, Plaintiffs investigated and determined, in line with the above-mentioned 2024 Stantec Safety Assessment Report and the February 29, 2024 Memorandum for Record issued by the Richland County Building Official, that the Condominium Buildings could not be economically repaired. Therefore, Plaintiffs determined to demolish the Condominium Buildings because of the numerous material violations of the Building Code as implemented in Richland County that existed due to the condition of the Condominium Buildings.

57. To that end, the Plaintiffs sought and obtained from Richland County a Demolition Permit for the Condominium Buildings; Demolition Permit No. DM24-00090 was issued August 30, 2024.

58. Pursuant to the issued Demolition Permit, the Plaintiffs began pre-demolition work in and around the Condominium Buildings during the period from approximately September 1, 2024 to approximately mid-October 2024 and provided courtesy notice of the intended demolition to the Master Association.

59. Plaintiffs did not, and do not, believe that any approvals by any party other than Richland County were, or are, necessary for the Plaintiffs to demolish the Condominium Buildings. However, on October 15, 2024, the Owners' Association filed suit in South Carolina against Plaintiffs in the Richland County Court of Common Pleas in a case captioned "*Village at Sandhill Property Owners Association, Inc. v. Promenade at Sandhill Condominium Association, Inc. et al*," Civil Action No 2024-CP-40-06165 ("First Lawsuit") to enjoin demolition of the

Condominium Buildings until such time as Plaintiffs undertook certain approval processes that the Owners' Association alleged were required under the Master Declaration.

60. Owners' Association was able to obtain a temporary restraining order and temporary injunction which required the Plaintiffs to follow what the Owners' Association interprets to be a demolition approval process in the Master Declaration (and which interpretation Plaintiffs reject)..

61. On March 13, 2026, the Owners' Association and Plaintiffs entered into a Consent Order of Dismissal without Prejudice ending the First Lawsuit. A true and correct copy of that Order is attached at Exhibit C.

62. The parties entered into the Consent Order prior to a permanent determination by a court of the central issue of whether or not the Owners' Association or ARC could prevent the demolition of the Condominium Buildings or otherwise impose conditions on the demolition requiring the Condominium Buildings to be rebuilt. To that end, at paragraph 5 of the Consent Order, the parties reserved the issue for another day by stating: "[t]his order, the TRO, and the Order Granting Motion for Temporary Injunction (filed January 13, 2025) shall not be res judicata or collaterally estop any party from taking a position or asserting an argument in any future action." In executing the Consent Order, it was the hope of the parties thereto that the issue of ARC entitlement to review demolition and other such disputes could be mooted should a buyer of the Condominium Buildings be found and the issues mooted by a developer that could construct new apartments or condominiums or could renovate the Condominium Buildings.

63. In the approximate 18-month period commencing with the filing of the First Lawsuit, the Plaintiffs marketed the Condominium Buildings for sale and received approximately eight (8) written proposals to purchase. All of these were conditioned on both dismissal of the First Lawsuit

and the potential buyers' acceptance of the conditions of the Condominium Buildings and repair costs. No potential buyer proceeded to an unconditioned contract or closing of a purchase.

64. This hoped for resolution in the Consent Order unfortunately did not occur as Plaintiffs have been unable to find a buyer, or even any third-party to even take the Condominium Buildings as a gift as the Condominium Buildings are beyond economic repair and are an obstacle to future development.

65. Given this reality, the Plaintiffs are willing to spend millions of dollars (as they were in 2024) to demolish the Condominium Buildings so that a buyer can be found to re-develop the real property. Even though Plaintiffs have no obligation to demolish the Condominium Buildings, they believe it is in their best interests (and the best interest of the t Sandhill Development) to do so.

**THE FIRST SUBMISSION TO THE ARC AND ABUSE OF AUTHORITY BY THE ARC**

66. Upon information and belief, in late 2024, and only after the Plaintiffs notified the Owners' Association of the Plaintiffs' intention to demolish the Condominium Buildings, did Alan Kahn and Charles Kahn (collectively, the "Kahn Group"), form the ARC and did the Kahn Group appoint Alan Kahn, Charles Kahn, and a landscape architect, Charles Howell, to be members of the ARC.

67. Upon information and belief, the ARC was not constituted until late 2024 and was then-constituted for the sole purpose of denying the Plaintiffs' submission for approval of the intended demolition of the Condominium Buildings and otherwise interfering with Plaintiffs' lawfully permitted demolition of the Condominium Buildings.

68. Notwithstanding the above derelictions under the Master Covenants, Defendant has existed as a South Carolina corporation since at least 2001 and remains in good standing as of the

present. The Defendant had, at these times, the legal existence and authority to perform its duties under the OEA, as an "approving Party." On information and belief, the Defendant failed to exercise such duties.

69. Without conceding that the ARC had authority to approve any potential demolition of the Condominium Buildings (which is expressly denied), Plaintiffs submitted demolition plans and conceptual redevelopment plans to the ARC in late 2024. These steps were necessary to comply with the TRO and Temporary Injunction issued by the Circuit Court in the First Lawsuit.

70. In response to the Plaintiffs' submission, the ARC responded on December 4, 2024 by denying the request for demolition, by asking for more information on redevelopment plans, and by requiring financial guarantees, and letters of credit and mortgages securing such guarantees, together with a guaranteed completion timeline for such redevelopment plans.

71. The demand by the ARC and Owners' Association for financial guarantees from Plaintiffs is specifically prohibited by the Master Declaration. Section 3.3(A) of the Master Declaration provides: "…it is acknowledged and agreed that no Party shall have an obligation to commence construction of any Building on its Tract…"

72. Notwithstanding this prohibition, the ARC and Owners' Association arbitrarily and capriciously required written and binding assurances, from the ultimate beneficial owner of the Plaintiffs, that the Condominium Buildings would be reconstructed at Plaintiffs' cost within a guaranteed time period, in contravention of the limitation in Section 3.3 (A) of the Master Declaration.

73. The Master Declaration and OEA nowhere provide authority to the Defendant, the Owners' Association or to the ARC to prohibit demolition within the Sandhill Development. Indeed, the word "demolition" appears in the Master Declaration only at Section 9.03(h) under the

heading "Nonconforming and Unapproved Improvements" with respect to the "demolition and removal of any unapproved improvement" which only applies to any new structure built or added by an Owner when approval by the Owners' Association/ARC for such structure was expressly required by the Master Declaration and was not obtained.

74. Thus, the Master Declaration encompasses the demolition concept in a limited situation, but nowhere requires that the Defendant, Owners' Association or ARC approval of the same when a member of the Owners' Association determines that demolition of its buildings is in its best interest as an owner and member of the Owners' Association.

75. Further, the OEA at Section 4.3(B) does not provide authority for the Defendant, the Owners' Association, ARC, or any member of the Owners' Association to require an owner to demolish or rebuild any structure absent a casualty event (like a fire). Even then, such provisions are too vague to be enforceable. The current condition of the Condominium Buildings was not caused by a casualty event.

76. The Master Declaration and OEA nowhere provide authority to the Defendant, the Owners' Association or to the ARC to require the rebuilding of any improvement within the Sandhill Development by a member of the Owners' Association *except* in circumstances not applicable here.

**THE CURRENT STATUS OF THE CONDOMINIUM BUILDINGS**

77. The original demolition permit issued by Richland County in 2024 has expired.

78. Plaintiffs desire to demolish the Condominium Buildings now for the reasons above stated and intend to seek a new demolition permit from Richland County.

79. At or near the time of the filing of this action, and without admitting that the ARC is entitled to approve demolition plans (which Plaintiffs expressly deny), Plaintiffs are resubmitting

their 2024 demolition plans to the ARC ("2026 Plans.") Plaintiffs are not now seeking to rebuild the Condominium Buildings.

80. Plaintiffs in the 2026 Plans will address questions that the ARC had in 2024 regarding the methods of demolition, timing, environmental and safety protocols. To the extent that the demolition has any effect on the common areas owned by the Owners' Association or other members of the Owners' Association, such concerns will be addressed.

81. Upon information and belief and based on its prior response to the 2024 submission, the ARC will arbitrarily not approve any demolition plan for the Condominium Buildings without arbitrarily requiring additional conditions such as a timeline for reconstruction and/or a cash or surety bond guaranteeing reconstruction, including the 2026 Plans.

82. Upon information and belief, the Defendant will also attempt to exercise rights it claims it has under the OAE to limit or prevent demolition of the Condominium Buildings and/or compel Plaintiffs to rebuild them.

## THE CLAIMS

## FOR A FIRST CLAIM

**(Declaratory Judgment-No Right of Defendant to Prohibit Demolition)**

83. Plaintiffs re-allege, as if fully set forth herein, the above stated allegations.

84. As above alleged, the Defendant does not have the authority under the Master Declaration and OEA to prevent Plaintiffs from demolishing the Condominium Buildings.

85. Plaintiffs seek a Declaratory Judgment that any attempt by the Defendant that imposes financial conditions or reconstruction conditions on Plaintiffs in order to approve demolition of the Condominium Buildings is without a basis in the Master Declaration or the OAE and is arbitrary and capricious.

86. Plaintiffs ask for a Declaratory Judgment that the Defendant cannot prohibit or set arbitrary or unreasonable conditions upon which Plaintiffs may demolish the Condominium Buildings.

87. Plaintiffs ask for a Declaratory Judgment that the Plaintiffs' 2026 Plans for the demolition of the Condominium Buildings are reasonable and that the Defendant may not impose arbitrary conditions not expressly authorized by the Master Declaration or OAE.

**FOR A SECOND CLAIM**
**(Declaratory Judgment-No Right of Defendant to Require Reconstruction)**

88. Plaintiffs re-allege, as if fully set forth herein, the above stated allegations.

89. As above alleged, the Defendant does not have the authority under the Master Declaration and OEA to force Plaintiffs to repair or reconstruct the Promenade Condominium Buildings after their demolition; nor does the Defendant have the authority under the Master Declaration or the OEA to make such repairs or reconstruction themselves and attempt to charge back Plaintiffs for the same.

90. Plaintiffs ask for a Declaratory Judgment that Defendant cannot require Plaintiffs to reconstruct the Condominium Buildings upon their demolition.

91. Plaintiffs alternatively ask for a Declaratory Judgment that Defendant is estopped, has waived, or is barred by laches from asserting any rights under the Master Declaration or the OAE that the Defendant may have to force the Plaintiffs to reconstruct the Condominium Buildings upon their demolition or pay for the same.

**FOR A THIRD CLAIM**
**(Injunctive Relief)**

92. Plaintiffs re-allege, as if fully set forth herein, the above stated allegations.

93. Any action by the Defendant to interfere with the Plaintiffs' free exercise of their property rights and have demonstratively inhibited the free marketability of the real property in the Sandhill Development owned by Plaintiffs.

94. Any such action by Defendant will be a *de facto* cloud on Plaintiffs' title of their real property to the extent that Defendant attempts to assert a claim that Plaintiffs must pay for new construction and that this is a financial obligation that no bona fide prospective purchaser will assume.

95. Pursuant to Fed. R. Civ. P. 65, Plaintiffs seek a temporary injunction and permanent injunction prohibiting the Defendant from exercising any claimed right to prevent Plaintiffs from having the Condominium Buildings demolished and from imposing adding arbitrary conditions upon such demolition.

96. Plaintiffs seek a temporary injunction and permanent injunction prohibiting the Defendant from imposing arbitrary conditions not expressly authorized by the Master Declaration or OAE on Plaintiffs' 2026 Plans for the demolition of the Condominium Buildings.

97. Plaintiffs also seek a temporary injunction and permanent injunction prohibiting the Defendant from attempting to force Plaintiffs to reconstruct the Condominium Buildings or pay for any reconstruction.

WHEREFORE, Plaintiffs hereby request that the Court grant the relief sought by Plaintiffs against Defendant, Plaintiffs' attorney's fees and costs, and any other relief as the Court may find appropriate.

Respectfully submitted,

BURR & FORMAN LLP

*/s/Benjamin E. Nicholson, V*
Benjamin E. Nicholson, V (Fed. ID No. 4958)
nnicholson@burr.com
Benjamin R. Jenkins, IV (Fed. ID No. 14138)
bjenkins@burr.com
1221 Main St., Suite 1800 (29201)
P.O. Box 11390 (29211)
Columbia, South Carolina
T: 803.799.9800
F: 803.933.1438

*Attorneys for Plaintiffs*

September 30, 2026